Jessie Joe PATRICK, Appellant,

v.

The STATE of Texas, Appellee.

No. 71105.

Court of Criminal Appeals of Texas, En Banc.

June 28, 1995.

Rehearing Overruled Sept. 20, 1995.

Gary A. Udashen—on appeal only—Dallas, for appellant.

John Vance, Dist. Atty. and Teresa Tolle, Jeri Sims, Jane Little & Bobby Francis, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant was convicted of murder in the course of committing or attempting to commit burglary. See V.T.C.A., Penal Code, Section 19.03(a)(2). After the jury returned an affirmative finding on both of the special issues submitted under Article 37.071(b)(1) and (2), V.A.C.C.P., the trial court imposed the death penalty. Appellant raises thirty-one points of error in this case which is before us on automatic, direct appeal. We will affirm.

Appellant challenges the sufficiency of the evidence at both the guilt/innocence and punishment phases; therefore, we will review the relevant facts. On July 8, 1989, the eighty-year-old victim was found murdered in the bedroom of her Pleasant Grove home. Her throat had been slashed, she had several fractured ribs, and there were bruises to her head, arms, chest, legs, and vaginal canal. A forensic examination revealed the presence of spermatozoa in her vaginal canal. An officer who had been at the scene testified that Redd had been sexually assaulted.

The bathroom window, which had been forced open, appeared to be the point of entry. The bedroom had been ransacked, and although the victim was known to keep large amounts of money in her purse, no money was found in the house. A bloody sock impression was found on the floor of the bedroom.

A blood stained rock was later discovered in appellant's yard just two houses south of the victim's residence. After receiving written consent from appellant's girlfriend to search the home which she shared with the appellant, officers discovered appellant's bloody sock, some bloody toilet tissue, and a

pair of jeans with suspicious stains. Blood from appellant's sock was consistent with the blood type of the victim. A DNA gene amplification test matched the DNA from blood on the sock and rock with the victim's blood. Hair samples found at the scene were consistent with appellant's hair. A forensic dentist identified teeth marks on the victim's arm as belonging to appellant. The murder weapon, a knife found at the crime scene, was also identified as the only knife that appellant owned.

A palm print was lifted from the bathroom window of the victim's bathroom and was identified as that of the right palm of the appellant. Appellant's fingerprint expert testified that he could not form an opinion either way as to whether the print was made by the appellant because there was not enough of the print taken from the window. On rebuttal the State's fingerprint expert also identified the print as appellant's.

On the day of the murder, appellant purchased an automobile for $850 cash. Appellant then fled the State. He was arrested on July 22, 1989, in Jackson, Mississippi. While in custody appellant gave three inconsistent explanations for his possession of the money used to buy the car and leave the state. None of the explanations admitted receiving the money or taking the money from the deceased.

■ In points of error one and two, appellant contests the sufficiency of the evidence to prove his guilt. When reviewing sufficiency of the evidence this Court must decide "whether, after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (emphasis in original).

■ In point of error one, appellant contends that the evidence is insufficient to prove that he committed murder in the course of committing burglary. Appellant

concedes that the evidence, viewed in a light most favorable to the verdict, is sufficient to prove that he murdered the deceased. We agree and hold that the evidence is sufficient to satisfy the *Jackson* standard with respect to the murder. However, appellant argues that the State must also prove that the murder was committed during the course of robbery. Appellant, citing *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Cr.App.1986), argues that the State must show a nexus between the commission of the murder and the underlying theft: i.e, the intent at the time of or prior to the murder to obtain or maintain control over the property. However, in that case, as in the others cited by appellant, the appellant was charged with capital murder in the course of committing or attempting to commit a *robbery*. The indictment and application paragraph of the charge in appellant's case requires a finding of murder in the course of *burglary*. We hold that any rational trier of fact could have found from the evidence that appellant entered the deceased's residence without her consent, murdered her, and committed theft or sexual assault. Such is sufficient to prove capital murder in the course of committing burglary. See V.T.C.A., Penal Code, Section 30.02(a)(3).

■ Alternatively, appellant argues that the evidence is insufficient to prove that he entered the deceased's house without her effective consent. In particular, he argues that the only evidence to show he entered without effective consent is the palm print found near the apparent point of entry. He argues that the evidence showed he had been in the victim's house prior to the capital offense, which would not rule out the reasonable hypothesis that the palm print was made at a time other than during the commission of the offense.[1] We disagree. First, the evidence showed that appellant had been to the victim's residence, but no evidence showed he had ever been inside the residence prior to the date of the murder. In fact, appellant's girlfriend testified that appellant

---

1. In applying the *Jackson* standard to circumstantial evidence cases decided prior to our decision in *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr. App.1991), we have adopted as a tool for analysis the following "analytical construct": that the evidence must exclude every other reasonable hypothesis other than the guilt of the accused. *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Cr. App.1983), overruled in part by *Geesa*.

had never been in the residence. Second, the window had been forced open. Third, the forensic evidence—palm print, hair sample, blood match, DNA amplification test—places appellant inside the residence at the scene of a murder. Fourth, money was missing from the residence, appellant purchased a car with a large sum of money on the day of the murder, and then appellant fled town. From these facts, the jury evidently concluded that appellant had entered the residence without the victim's consent and found any alternative hypothesis unreasonable. We are of the opinion that a rational trier of fact could have come to the same conclusions. Point of error one is overruled.

In point of error two, appellant maintains that the evidence is insufficient to prove that he had the specific intent to cause the victim's death. He points to the testimony of the Dallas County Medical Examiner, who testified that, had the victim had medical attention, she would have had "a great chance" to live. The medical examiner also testified that a younger person could have survived the wounds, but an eighty-year-old woman would not.

 Appellant was charged, pursuant to V.T.C.A., Penal Code, Section 19.02(a)(1), with intentionally causing the death of Mrs. Redd. Both parties agree that the statute requires a showing that the appellant intended the result of his conduct. *Lugo–Lugo v. State*, 650 S.W.2d 72, 80 (Tex.Cr.App.1983). Intent can be inferred from the acts, words, and conduct of the accused. *Beltran v. State*, 593 S.W.2d 688, 689 (Tex.Cr.App.1980). It may also be inferred from the extent of the injuries and the relative size and strength of the parties. *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex.Cr.App.1973), cert. denied, 416 U.S. 944, 94 S.Ct. 1953, 40 L.Ed.2d 296 (1974). The State correctly points out that the requisite intent could be inferred by any rational jury from several items of evidence. The jury could have determined that: appellant entered the deceased's residence with a deadly weapon, a butcher knife; he was thirty-one years old and 153 pounds, while the victim was eighty years old and weighed 130 pounds; appellant slashed the deceased's throat, broke several of her ribs, inflicted several bruises and lacerations, and caused a subscapular hemorrhage. All of these circumstances could have been found by a rational trier of fact to prove beyond a reasonable doubt the intent to bring about the victim's death. Point of error two is overruled.

 In point of error three, appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to the first special issue, which asks whether appellant, beyond a reasonable doubt, caused the death of his victim deliberately and with the reasonable expectation that death would result. Article 37.071(b), V.A.C.C.P. We have addressed this issue many times. Our standard of review for the special issues is the same standard we use for reviewing the evidence during the guilt/innocence phase of a capital murder conviction: whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could find all of the elements of the special issues beyond a reasonable doubt. *Livingston v. State*, 739 S.W.2d 311, 338–340 (Tex.Cr.App. 1987), cert. denied 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). The jury is entitled to consider all the evidence submitted during guilt/innocence. *Green v. State*, 682 S.W.2d 271, 287 (Tex.Cr.App.1984).

 Appellant's argument hinges on the fact that we have yet to supply the bench and bar with a definition of "deliberately." Instead, we have only offered some guidance on the issue, including the observation that "deliberately" is something more than intentional but less than premeditation. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Cr.App. 1991), cert. denied, 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992). Appellant contends that the evidence, as outlined in point of error two, may prove intentional conduct, but it does not rise to the level of deliberate conduct. Specifically, he directs our attention to the testimony of the medical examiner as evidence that appellant's conduct was not deliberate. We are not persuaded. Whether the deceased might have survived the attack on her, or whether a younger person would have survived, is only marginally relevant, if at all, to the issue. The salient facts are that appellant entered the residence without con-

sent, armed with a deadly weapon, with which he slashed the throat of the deceased. This itself is probative of deliberate conduct. See *Livingston,* supra at 339. In addition, he inflicted multiple other wounds and bruises, as well as fracturing her ribs. We hold, as we have done before, see *Hernandez,* supra, and *Livingston,* supra, that the evidence of the circumstances of this offense are sufficient to support any rational trier of fact's determination that appellant acted deliberately. Point of error three is overruled.

In point of error four, appellant argues that the evidence is insufficient to support the jury's answer to the second special issue, which asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), V.A.C.C.P. The parties substantially agree on the evidence the jury had before it in deciding whether appellant was a future danger to society: the circumstances of the offense; three unadjudicated offenses; one adjudicated offense;[2] and the testimony of three probation officers and a TDC institutional parole officer, who testified that appellant was generally cooperative but prone to aggressive behavior and violence. Appellant put on no evidence during punishment. The circumstances of the offense indicate that it was particularly brutal and calculated. This was certainly a factor for the jury to consider. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Cr.App.1987). Appellant's adjudicated offense was aggravated assault in 1985. During the assault appellant struck three women, exhibited a pocket knife, and threatened to kill one of the women. One of the events leading up to the adjudicated offense, an unadjudicated offense occurring in 1984, included a sexual assault on one of the parties to the adjudicated aggravated assault. Appellant's girlfriend testified to an incident of sexual assault that occurred some hours before the capital murder in the instant case. Appellant's ex-wife testified to another sexual assault in 1982 in which she was tied to a bed. On this occasion appellant exhibited a .12 gauge shotgun, sexually and physically abused the woman, and threatened to kill her. These unadjudicated sexual assaults were properly before the jury for their consideration. *Williams v. State,* 622 S.W.2d 116, 120 (Tex.Cr.App.1981). The opinions of the various probation and parole personnel were also factors for the jury to consider. We hold that any rational trier of fact could have found from the circumstances of the offense, appellant's adjudicated offense, and the assaultive nature of the unadjudicated offenses, that appellant would constitute a future danger to society. Point of error four is overruled.

In points of error five through seven, appellant claims that the trial court erred in sustaining three of the State's challenges for cause during voir dire. In each case he claims the venirepersons did not show that their views about the death penalty would substantially impair their ability to carry out their duties as jurors.[3] When reviewing a trial court's decision to grant or deny a challenge for cause we look at the entire record to determine if there is sufficient evidence to support the court's determination. *Farris v. State,* 819 S.W.2d 490, 501 (Tex.Cr.App.1990), cert. denied, 503 U.S. 911, 112 S.Ct. 1278, 117 L.Ed.2d 504 (1992). Great deference is given to the court's decision "because the trial court is present to observe the venireperson, including the demeanor and tenor of voice of the venireperson." *Pyles v. State,* 755 S.W.2d 98, 107 (Tex.Cr.App.1988), cert. denied, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988).

In point of error five appellant claims that venireperson Ida Balous was improperly excused for cause. The State pointed out a number of infirmities in the venireperson's responses; however, most pertinent for our disposition of this point were her statements that "intentional" and "deliber-

---

**2.** In point of error twenty-five, appellant contends that either his conviction or sentence was void. We find that contention without merit, as discussed infra.

**3.** Appellant contends that the trial court improperly informed each venireperson that they would be asked to give appellant the death penalty. Appellant did not object on this ground at trial; therefore, it is waived. Tex.R.App.Pro., Rule 52(a).

ately" meant the same thing, and that "probability" and "possibility" meant the same thing.[4] The State may properly challenge any prospective juror who has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment. Article 35.16(b)(3), V.A.C.C.P. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with law. *Caldwell v. State*, 818 S.W.2d 790, 795 (Tex. Cr.App.1991), cert. denied, 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992).

■■■ We have previously stated that "[a] capital venireman who cannot distinguish between an 'intentional' and a 'deliberate' killing has demonstrated an impairment in his ability meaningfully to reconsider guilt evidence in the particular context of special issue one." *Martinez v. State*, 763 S.W.2d 413, 419 (Tex.Cr.App.1988). Such a prospective juror is properly challengeable. We hold that the same is true for a venireperson who cannot differentiate "probability" and "possibility." Such a venireperson would be impaired in evaluating the evidence offered to prove future dangerousness.[5] Venireperson Baldous, after unequivocally replying that "intentional" and "deliberately" meant the same thing, was asked if she could give the two terms different meanings. She replied:

"When you intend to do something that means when you went out there to do it. And, deliberate ... you must meant [sic] to hurt somebody ... that's what I think."

It is not at all clear whether this example was meant to show a distinction between the terms or illustrate their identity. The trial court may well have believed the latter, particularly since the trial court was present to observe the venireperson's demeanor and tone of voice when she spoke. As to "probability" and "possibility," Baldous never indicated that she observed a distinction. We

hold that the trial court did not abuse its discretion in granting the State's challenge. Point of error five is overruled.

■■■ In point of error six, appellant maintains that it was error for the trial court to sustain the State's challenge for cause of prospective juror Ronald Thomas. We disagree. Thomas stated that he was definitely opposed to the death penalty. He could not understand how the death penalty could be imposed unless the killing was premeditated. He believed that a life sentence should be life without parole, and he testified that this would probably affect his deliberations. He indicated to defense counsel that he thought he could answer the special issues truthfully. However, he finally conceded to the trial court that he could not take the oath and follow the law knowing that his decision would result in the death penalty. He testified that "[p]robably what I would end up doing would be following what the rest of the jurors wanted to do. It would not be a decision that I made." Clearly, this was a venireperson whose views on the death penalty would have prevented him from carrying out his duties on the jury. See *Goodwin v. State*, 799 S.W.2d 719, 735 (Tex.Cr.App.1990); *Vuong v. State*, 830 S.W.2d 929, 942–944 (Tex.Cr.App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). No abuse of discretion is shown. Point of error six is overruled.

■■■ In point of error seven, appellant claims that the trial court improperly excused Cerise Tolliver for cause. We disagree. The juror stated that she could not answer the special issues "yes" knowing the death penalty would result. Also, she stated that she could not take the oath. The venireperson clearly was impaired in her ability to function as a juror. It was no abuse of discretion to grant the challenge for cause. Point of error seven is overruled.

---

4. Appellant and the State argue at length about Balous' ability to read and write. Since we dispose of this point on other grounds, we decline to address their respective contentions.

5. In *Cuevas v. State*, 742 S.W.2d 331, 347 (Tex. Cr.App.1987), cert. denied, 485 U.S. 1015, 108

S.Ct. 1488, 99 L.Ed.2d 716 (1988), we held that the trial court did not abuse its discretion in denying appellant's challenge for cause directed to a venireperson who testified that "probability" was stronger than "possibly."

In points of error eight and nine appellant maintains that his United States and Texas constitutional right to be free from an unreasonable search and seizure were violated. United States Constitution, Amendment IV; Texas Constitution, Article I, Section 9. Point of error nine relies on the Texas Constitution for relief; however, appellant does not set out in argument or authorities how the Texas Constitution affords him relief not afforded to him, if at all, by the United States Constitution. Therefore, this claim is waived because it is inadequately briefed. See *Heitman v. State,* 815 S.W.2d 681, 690–691, n. 23 (Tex.Cr.App.1991). Thus, we direct our attention to point of error eight.

The facts are not in dispute. Martha Gibson, appellant's girlfriend, had a fight with appellant the night prior to the murder. She left the residence, taking her five-month old son. She returned later and retrieved some of her personal belongings. At the time, she had been living with appellant for about two years, and she and appellant had been living in their residence for about one month. Gibson and appellant were renting the residence from appellant's aunt. The day the deceased's body was discovered Gibson gave verbal and written permission to the police to search their house. During the search the police discovered a bloody sock belonging to appellant, bloody toilet tissue, and a pair of blue jeans on which there was a stain. On the occasion of this search Gibson retrieved some more of her personal belongings.

The State and appellant agree that the Fourth Amendment allows persons with common authority over property to consent to the search of the property. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "Common authority" is mutual use of the property by persons generally having joint access or control for most purposes. *Illinois v. Rodriguez,* 497 U.S. 177, 179, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). Appellant contends that Martha Gibson had moved out of the residence where the incriminating evidence was found. Therefore, he reasons, she no longer had common authority over the property, and its search was illegal. We disagree. A hearing on appellant's motion to suppress

was held outside the presence of the jury. At the hearing Gibson testified she, not appellant, had signed the lease. She testified that she was responsible for one-half the utility bills and appellant was responsible for one-half the bills. She told appellant on the night she left the residence that she was leaving because she was scared. Appellant told her before she left that he was afraid she was leaving him permanently, but Gibson assured him that was not the case. The first time Gibson talked with police she informed them that she and appellant were living together. Gibson returned several times to pick up personal effects. We hold that the evidence demonstrates that Gibson had not relinquished common authority over the residence, and that the trial court did not abuse its discretion in overruling appellant's motion to suppress. Point of error eight is overruled.

In point of error ten, appellant complains that the State, during closing argument at the punishment phase, improperly commented on his right to remain silent, thus violating his United States and Texas constitutional right against self-incrimination and Article 38.08, V.A.C.C.P. The alleged improper argument was as follows:

"Questions are not evidence; they are not facts. All this about a foster home and being abused and all, all that was questions.

"Not one fact has been presented to you about foster homes and a bad childhood and being abused.

"If it was there, they can bring it to you. They told you I can bring anything—"

Appellant objected to this argument and was overruled.

This point is without merit. We set out the appropriate jurisprudence in *Banks v. State,* 643 S.W.2d 129, 134–35 (Tex. Cr.App.1982), cert. denied, 464 U.S. 904, 104 S.Ct. 259, 78 L.Ed.2d 244. To violate appellant's constitutional and statutory rights, the language, viewed from the jury's perspective, "must be manifestly intended or of such a character that the jury would necessarily and naturally take it as a comment on the accused's failure to testify." *Id.* A mere indi-

rect or implied allusion to the accused's failure to testify does not violate appellant's rights. A remark that calls attention to the absence of evidence which only the defendant could supply will result in reversal; however, if the language can reasonably be construed to refer to appellant's failure to produce evidence other than his own testimony, the comment is not improper.

In the instant case, appellant had cross-examined two witnesses about his experiences in a foster home and about his alleged child abuse. Neither witness was particularly enlightening about these experiences. Appellant pointed this fact out in his summary of the evidence immediately prior to the prosecutor's argument. The prosecutor's comment could reasonably be construed to refer to appellant's failure to produce evidence other than his own testimony. Point of error ten is overruled.

In point of error eleven, appellant urges for the first time on appeal that the trial court erred in the guilt/innocence phase of the trial in not limiting the definitions of "knowingly" and "intentionally" which were given to the jury in the charge. Looking to the record, the trial court defined the words "intentionally" and "knowingly" in the charge as follows:

"A person acts intentionally, or with intent, with respect *to the nature of his conduct* or to the result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result.

"*A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.* A person acts knowingly or with knowledge, with respect to a result of his conduct when she [sic] is aware that his conduct is reasonably certain to cause the result.*" (Emphasis added)

Appellant claims the emphasized portions of the definitions permitted the jury to find criminal liability from the knowledge of conduct or circumstances surrounding the conduct (i.e., intent to cut with a knife or hit with a blunt object) rather than from the consequences or results of the conduct (intent to cause the death of the deceased).

In our opinion, *Hughes v. State*, 897 S.W.2d 285 (Tex.Cr.App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995), we addressed almost an identical situation. There, the defendant was charged and convicted of capital murder. In proving capital murder, the State must prove that the accused intentionally or knowingly caused the death of an individual and also that the accused engaged in other criminal conduct (i.e., kidnapping, robbery, aggravated sexual assault, escape from a penal institution) or had knowledge of certain circumstances (i.e., that the victim was a peace officer). *Hughes*, 897 S.W.2d at 295. We have therefore recognized that capital murder is a result of conduct offense which also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct which elevates the intentional murder to capital murder. *Id.*, at 295. We accordingly recognized that in a capital murder case involving more than one conduct element that it would not be error for the definitions to include more than the result of conduct element. *Id.* at 295–96. However, under the Court's reasoning in *Cook v. State*, 884 S.W.2d 485, 491 (Tex.Cr.App.1994), it would be error in a capital murder case involving only two of the three conduct elements.

The indictment in the instant case charged that:

"[Appellant] did then and there knowingly and intentionally cause the death of [the deceased] by cutting said [the deceased] with a knife, a deadly weapon, and by striking said [the deceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, and the defendant intentionally did cause the death of the deceased while the said defendant was in the course of committing and attempting to commit the offense of Burglary of a Habitation of [the deceased][.]"

This offense can be viewed as including all three of the conduct elements. See *McQueen v. State*, 781 S.W.2d 600, 603 (Tex.

Cr.App.1989). The State was required to prove that appellant intentionally caused the death of the deceased which is a result of conduct. See *Cook,* 884 S.W.2d at 490. The State was further required to prove that appellant committed this intentional murder while in the course of committing or attempting to commit burglary of a habitation. The charge to the jury provided:

"A person commits burglary of a habitation if, without the effective consent of the owner he enters a habitation and commits or attempts to commit a felony or theft.

" 'Theft' means the unlawful appropriation of property with the intent to deprive the owner of the property." [6]

"Enters the habitation" is a result of conduct element while "without the effective consent" is a circumstance surrounding the conduct element. *Id.* at 493 n. 5 (Maloney, J., concurring). "The unlawful appropriation" in the definition of theft refers to the nature of the conduct (the nature being that of unlawful appropriation). *See id.* Because this offense contained all three of the conduct elements, the trial court did not err in defining the culpable mental states to nature, result, and circumstances surrounding conduct. The trial court's error, instead, was in not limiting the additional language concerning the culpable mental state to proving the "conduct element" of the underlying offense. *Hughes,* 897 S.W.2d at 296 n. 16. Our next inquiry must be whether the error resulted in some actual, rather than theoretical, harm to appellant. *Hughes,* 897 S.W.2d at 296; *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Cr. App.1986); and *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1984).

 For charge error that was not preserved at trial, the error must have been so harmful that the defendant was denied "a fair and impartial trial." *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Cr.App.1986); *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App. 1984). In other words, a defendant must have suffered actual "egregious" harm. *Arline,* 721 S.W.2d at 351; *Almanza,* 686

S.W.2d at 171. For both preserved and unpreserved charging error, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Arline,* 721 S.W.2d at 351–52; *Almanza,* 686 S.W.2d at 171. In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes,* 897 S.W.2d at 296; *Cook,* 884 S.W.2d at 492 n. 6.

The relevant portions of the trial court's charge to the jury read as follows:

"To warrant a conviction of the defendant, [appellant], of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant, [appellant], was engaged in the commission or attempted commission of the felony offense of burglary of a habitation of [the deceased], as defined in the charge, but also that during the commission of the burglary of a habitation or attempted commission thereof, if any, the defendant, [appellant], caused the death of [the deceased], by cutting said [the deceased] with a knife, a deadly weapon, or by striking said [the deceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, *with the intention of thereby killing* said [the deceased]. Unless you find from the evidence beyond a reasonable doubt that the defendant, [appellant], on said occasion, *specifically intended to kill* the said [the deceased] when he cut said [the deceased] with a knife, a deadly weapon, or when he struck said [the deceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, if he did cut said [the deceased] with a knife, a deadly weapon, or strike [the de-

---

**6.** While the State also presented evidence of a sexual assault, the strongest evidence was that of the theft of the victim's money from her home.

ceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, you cannot convict the defendant, [appellant] of the offense of capital murder.

"Now if you find from the evidence beyond a reasonable doubt that on or about the 8th day of July, 1989, in Dallas County, Texas, the defendant, [Appellant] did *intentionally cause the death* of [the deceased] by cutting said [the deceased] with a knife, a deadly weapon, or by striking said [the deceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, and the defendant did cause the death of the deceased while the said defendant, [appellant], was in the course of committing and attempting to commit the offense of burglary of a habitation of [the deceased], then you will find the defendant, [appellant], guilty of capital murder and say so by your verdict.

"Unless you find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant, [appellant] of capital murder and next consider whether the defendant, [appellant] is guilty of the offense of murder as included in the indictment.

"If you find from the evidence beyond a reasonable doubt on or about the 8th day of July, 1989, in Dallas County, Texas, the defendant, [Appellant] did *intentionally or knowingly cause the death* of [the deceased] by cutting said [the deceased] with a knife, a deadly weapon, or by striking said [the deceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, but you have a reasonable doubt as to whether the defendant, [appellant], was then and there engaged in the commission of burglary of a habitation of [the deceased] or attempted burglary of a habitation of [the deceased] at the time of the said murder, if any, then you will find the defendant, [appellant], guilty of murder, but not of capital murder.

"If you find from the evidence beyond a reasonable doubt on or about the 8th day of July, 1989, in Dallas County, Texas, the defendant, [Appellant] did *knowingly cause the death* of [the deceased], an individual, by cutting said [the deceased] with a knife, a deadly weapon, or by striking said [the deceased] with a blunt object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, if he did, but you have a reasonable doubt as to whether the defendant, [appellant], *intentionally killed* [the deceased], as the term "intentionally" has been defined herein, then you will find the defendant, [appellant], guilty of murder, but not capital murder, regardless of whether you find from the evidence beyond a reasonable doubt that defendant, [appellant], was then and there in the course of committing or attempting to commit the offense of burglary of a habitation of [the deceased]. (Emphasis added).

Although the definitions of "intentionally" and "knowingly" indiscriminately set forth the three alternative conduct elements, when those terms are viewed in their factual context, it becomes apparent which conduct element applies to which element of the offense. *Hughes,* 897 S.W.2d at 297. For instance, the application paragraph states that appellant "did intentionally cause the death of [the victim.]" The term intentionally directly modifies the phrase "cause the death". Referring back to the definitions of culpable mental states, it is obvious that the "result of conduct" and cause the result language are the applicable portions of the full code definitions. *See id.* We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to proving the conduct element of the underlying offense. *See id.* Point of error eleven is overruled.

■ In point of error twelve, appellant claims that the trial court erred in not submitting a jury charge that allowed the jury to logically consider mitigating evidence. The court submitted a charge which instructed the jury to consider mitigating evidence, explained the nature of mitigating evidence, and authorized the jury to return a "no" answer to one or both of the special issues if it thought that the mitigating evidence raised

a reasonable doubt whether the death penalty should be imposed. Appellant argues that the jury charge did not satisfy the dictates of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). We disagree. In *Fuller v. State,* 829 S.W.2d 191, 209 (Tex. Cr.App.1992), we held that a virtually identical instruction satisfied *Penry* with respect to any mitigating evidence appellant may have offered. Point of error twelve is overruled.

In point of error thirteen appellant contends that the trial court erred in overruling his request for a special charge during the punishment phase which would have limited consideration of extraneous offenses to special issue number two. He claims that the evidence was irrelevant to the jury's answer to special issue one, but that the jury may have considered it in answering that issue. As the State points out, "a limiting instruction is not required where evidence can be considered on any relevant issue in the case." *Lane v. State,* 822 S.W.2d 35, 40 (Tex.Cr. App.1991), cert. denied, 504 U.S. 920, 112 S.Ct. 1968, 118 L.Ed.2d 568 (1992). Thus, if the evidence was itself relevant, it was admissible to prove special issue one, and no limiting instruction was needed. We hold that the evidence in appellant's case was relevant to the first special issue. In the case of the adjudicated assault, appellant exhibited a deadly weapon. He threatened to kill one of the participants, and the record shows that appellant's motivation was to prevent the victim from revealing a previous sexual assault. When appellant sexually assaulted his wife, the assault transpired over several hours, and appellant exhibited a shotgun. His wife fled to another residence. Appellant went there, exhibited the weapon, and threatened to kill his wife. We hold that these acts sufficiently show that appellant would act violently and would use deadly force without hesitation. This is probative of deliberateness. *Id.* The evidence was relevant, and no error is shown. Point of error thirteen is overruled.

■ In points of error fourteen, sixteen, and nineteen, appellant maintains that the trial court erred by not defining the terms, "deliberately," "criminal acts of violence," and "probability" for the jury. In points of error fifteen, seventeen, and eighteen, appellant claims that Article 37.071, V.A.C.C.P., is unconstitutionally vague because it does not contain definitions of the words "deliberately," "criminal acts of violence," and "probability." In point of error twenty, appellant claims that the trial court erred when it refused his specially requested jury charge defining "criminal acts of violence." We have repeatedly noted that neither is our statute unconstitutionally vague for failure to define the terms of which appellant complains, nor need the trial court give the jury definitions for terms which it is presumed they understand. See *Boyd v. State,* 811 S.W.2d 105 (Tex.Cr.App.1991), cert. denied, 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466; *Fearance v. State,* 771 S.W.2d 486 (Tex.Cr.App.1988); *King v. State,* 553 S.W.2d 105 (Tex.Cr.App.1977), cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). Points of error fourteen through twenty are overruled.

■ In point of error twenty-one, appellant maintains that Article 37.071, V.A.C.C.P., is unconstitutional because it prohibits the jury from being told of the effect of its failure to answer any of the special issues. In point of error twenty-two, he makes the related claim that the trial court erred by not informing the jury that its inability to answer any of the special issues could result in a life sentence. Both contentions are without merit, as this court has previously discussed in *Davis v. State,* 782 S.W.2d 211, 221–22 (Tex. Cr.App.1989). To inform the jury of the effect of its answers to the special issues is to invite the jury to avoid its statutory duty. This interferes with the jury's fact finding function. Further, the information is a procedural matter, of no pertinence to the special issues, and not the subject of comment by either the trial court or the litigants. *Davis,* 798 S.W.2d at 222. Points of error twenty-one and twenty-two are overruled.

In point of error twenty-three, appellant contends that Article 37.071, V.A.C.C.P., is unconstitutional because there are no standards for this Court to use in determining the sufficiency of the evidence to support the jury's answers to the special issues. We disagree. Our standard for reviewing the

sufficiency of the evidence is set out in point of error three, supra. He further argues that, because the terms of which he complains in points of error fourteen through twenty are vague, our review of the evidence to support the jury's affirmative answers to the special issues must necessarily be vague. This argument fails, given our disposition of those points of error. Point of error twenty-three is overruled.

■ In point of error twenty-four appellant maintains that the Texas capital sentencing scheme is unconstitutional because the discretion whether to pursue the death penalty rests with the prosecutor. We find this familiar contention to be without merit for the reasons set out in *Barefield v. State*, 784 S.W.2d 38, 46 (Tex.Cr.App.1989), cert. denied, 497 U.S. 1011, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990); *Jurek v. Texas*, 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929, 940 (1976); and *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859, 889 (1976). Point of error twenty-four is overruled.

In point of error twenty-five, appellant claims that the trial court erred when it admitted an invalid prior conviction into evidence at the punishment phase of his trial. We need not reach the merits of appellant's contention because he made no objection or motion on this ground at trial. See Tex. R.App.Pro., Rule 52(a). He has waived this complaint. Point of error twenty-five is overruled.[7]

■ In point of error twenty-six appellant maintains that he received ineffective assistance of counsel at trial. He claims three specific errors:

1) counsel failed to discover that appellant's aggravated assault conviction was invalid and failed to object to its admission at trial;

2) counsel failed to object to the admissibility of the DNA evidence introduced by the State or contest its accuracy in any way; and

3) counsel failed to object to the incorrect definitions of knowingly and intentionally at the guilt/innocence phase of appellant's trial.

The two-prong test for evaluating ineffective assistance claims, derived from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is whether "the trial counsel's acts or omissions were outside the range of professional competent assistance, and if so, whether there is a reasonable probability that the result of the trial would have been different absent the deficient conduct." *Washington v. State*, 771 S.W.2d 537, 545 (Tex.Cr.App.1989), cert. denied, 492 U.S. 912, 109 S.Ct. 3229, 106 L.Ed.2d 578. Appellant has the burden of proving ineffective assistance by a preponderance of the evidence. *Cannon v. State*, 668 S.W.2d 401 (Tex.Cr.App.1984). With respect to the first prong, *Strickland* provides that a defendant must show that counsel's errors were so serious that he was not functioning as counsel. The performance inquiry must be whether counsel's assistance was reasonable under the circumstances. The court will indulge in a strong presumption that counsel's performance was reasonable. A strategic choice made after thorough investigation is practically unassailable. A strategic choice made after less than thorough investigation is reasonable to the extent reasonable professional judgment supports the limitation. *Strickland*, 466 U.S. at 686–91, 104 S.Ct. at 2063–66.

■ With respect to first alleged instance of ineffective assistance, appellant urges us to find that trial counsel erred by not making a thorough investigation into the aggravated assault conviction, determining its invalidity, and objecting to its admission at trial. Appellant's argument as to invalidity is as follows: appellant was convicted, according to the judgment, of "[a]ggravated [a]ssault, a third degree felony as charged in the indictment." The indictment charged appellant with aggravated assault with a deadly weapon, a knife. Pursuant to the judgment and Article 42.12(3g)(a)(2), V.A.C.C.P., appellant was not eligible for shock probation;

---

7. Appellant submitted by way of "supplemental letter brief" the case of *Hooks v. State*, 838 S.W.2d 643 (Tex.App.—Dallas, 1992), in support of this point. In view of our disposition of points of error twenty-five and twenty-six, we decline to pass on the reasoning of *Hooks*.

however, the court subsequently placed appellant on probation. The evidence at trial called into question whether the knife used in the assault was a deadly weapon. At this point, appellant argues, counsel should have realized that either the court illegally sentenced him to probation or appellant was guilty only of misdemeanor assault; thus, counsel should have investigated this possibility, and should have objected once the State sought to introduce the adjudicated offense by way of a penitentiary packet. We disagree. On its face, the judgment in appellant's aggravated assault conviction does not recite a separate finding that appellant used a deadly weapon. The judgment does nothing more than reflect the trial court's verdict. In order to trigger the provisions of Article 42.12(3g)(a)(2), V.A.C.C.P., "[t]here must be a separate and specific affirmative finding entered by the trial court in addition to the recitation of the offense for which the defendant is convicted." *Ex Parte Hughes*, 739 S.W.2d 869 (Tex.Cr.App.1987). See also *Jones v. State*, 596 S.W.2d 910 (Tex.Cr.App. 1980); *Ex Parte Brooks*, 722 S.W.2d 140 (Tex.Cr.App.1986). An affirmative finding is neither a recitation of the verdict nor a recitation of the offense in the judgment with the words "deadly weapon," "firearm," or other similar phrase added. *Brooks*, 722 S.W.2d at 142. We may presume that counsel was familiar with the applicable statutory provision and the cases interpreting it. Counsel could reasonably have determined that an objection would have been frivolous. We would further note that counsel may well have decided as a matter of trial strategy that it would have been imprudent to raise the deadly weapon issue before the jury. In either case, appellant has not shown that counsel's performance as to the admission of the pen packet was deficient, and, therefore, he cannot satisfy the first prong of the *Strickland* test. Finally, we conclude that even had counsel erred in not opposing the admission of the pen packet, there is no reasonable probability that the outcome of the trial was affected. The facts and circumstances of the offense were admitted through the testimony of the victims of the offense. Given the other punishment adduced against

appellant, appellant cannot overcome the second prong of *Strickland*.

■ Appellant next contends that counsel was ineffective for not objecting to the admission of the DNA evidence. He further claims that counsel's cross-examination of the State's DNA expert was ineffective. During a hearing outside the presence of the jury, counsel objected to the DNA evidence being admitted, although it is not clear whether this objection was to its admission at any time or at least until such time as he had the opportunity to study the written report prepared by the State's expert. Counsel's objection was overruled. When the evidence once more was offered, counsel did not renew his objection.

The State correctly points out that in *Kelly v. State*, 824 S.W.2d 568 (Tex.Cr.App.1992), we held that, where the admission of novel scientific evidence, such as DNA testing, is at issue, the proponent of the evidence must show the court that the evidence is relevant and that its probative effect outweighs any factor in Tex.R.Cr.Evi. 403 (prejudice, delay, etc.). We agree with the State that had counsel objected to the admission of the DNA evidence the State would easily have been able to establish that the evidence was relevant and not barred by any Rule 403 factor. Counsel could have reasonably perceived that an objection before the jury would have been frivolous. He was within bounds of professional competence in not making such an objection. As to cross-examination, the record shows that counsel was reasonably competent in examining the witness, given the disadvantage to which he was put by the production of the evidence. We hold that the first prong of *Strickland* has not been satisfied as to counsel's handling of the DNA evidence.

■ Finally, appellant contends that counsel was ineffective for not objecting to the definitions of "knowingly" and "intentionally" given in the jury charge at the guilt/innocence phase of his trial. In point of error eleven we held that the definitions given were correct when read in conjunction with the application paragraph of the charge. Thus, appellant's contention here is without merit.

In summary, none of the complaints raised with regard to trial counsel's performance satisfies the test set out in *Strickland.* Point of error twenty-six is overruled.

Appellant's twenty-seventh point of error asserts the trial court erred in quashing appellant's subpoena to a *Dallas Times Herald* reporter in connection with a hearing on appellant's motion for new trial. The record reflects that following completion of appellant's trial, Karen Reed, a reporter for the *Dallas Times Herald,* published an article which reported that one of appellant's jurors, Alicia McAlister, told Reed after the trial that a life sentence for appellant was out of the question "because there would have been the chance for parole." In relevant part, Reed's article said:

> "Juror Alicia McAlister said there was no indecision on the jury's part; a life sentence was out of the question, she said, because there would have been the chance for parole."

Appellant filed a motion for new trial generally alleging the jury committed misconduct by discussing "matters among themselves which they had been instructed not to discuss." Appellant attached a copy of the newspaper article to his motion for new trial.

Appellant caused to be issued a subpoena and a subpoena duces tecum to Reed commanding her to appear at the hearing on the motion for new trial to testify for appellant. The subpoena duces tecum commanded Reed to bring with her:

> "All notes and records pertaining to interviews with jurors who served on the jury [of appellant's trial] taken on or about 4–19–90."

Reed filed a motion to quash the subpoena in which she claimed she had no documents responsive to the subpoena, and a qualified privilege not to testify.

At the hearing on appellant's motion for new trial, all twelve jurors at appellant's trial, including McAlister, testified they did not discuss or consider parole during their deliberations on punishment. When appellant confronted McAlister with the statement attributed to her in Reed's article, McAlister claimed Reed misquoted her.

> "Q. Are you saying that you were misquoted in the newspaper if the newspaper reporter said that you did not consider a life sentence because you knew that there was a possibility of parole?
>
> "A. Uh-huh, yes.
>
> "Q. You're saying that the newspaper reporter took that down wrong?
>
> "A. Yes, sir."

Our review of the record also indicates appellant failed to present any evidence that the other eleven jurors talked to Reed after appellant's trial.

The trial court later considered Reed's motion to quash the subpoena and subpoena duces tecum. Reed's lawyer appeared for Reed and claimed Reed had no notes responsive to the subpoena duces tecum and Reed had a qualified privilege not to testify. One of appellant's lawyers claimed Reed previously told him she had some notes.

> "Q. Okay. Well, you are aware that [Reed] has no notes?
>
> "A. I—I'm certainly not aware of that and, as a matter of fact, I asked her personally—after this article appeared in the newspaper, I talked to her personally here in the hall and I asked her—I said, 'What did those people tell you,' and she said, 'Oh, a bunch of things.' She said, 'I took . . .—
>
> "I said something to the effect, 'Did you take notes about it,' and she said, 'Yes.' "

Appellant also claimed he should be afforded the opportunity to interview Reed to find out the truth about what McAlister told her and what Reed's notes showed.

> "Q. All right. So, the reason you would want [Reed] to come down here and testify would really be to impeach the testimony of the juror [McAlister]?
>
> "A. Well, I don't know about that, necessarily. But we wanted [Reed] here so that she could tell us what her notes showed that the jurors had— had told her about their deliberations, including the remark that she attributed to [McAlister]."

Reed's lawyer later argued that at best, appellant proved Reed may have had evidence that only impeached the testimony of another witness.

"In this case, it seems to me that, at best, [appellant's] only showing is that—that [Reed] may have evidence which would impeach the testimony of another—of another witness."

Appellant argued he was only "seeking the truth."

"Well, quite simply, we're seeking the truth, as the Court well recognizes, and notwithstanding what twelve jurors said or didn't say, I don't believe for a moment that the Court—[Reed] in this instance made up a story.

"We'd like to have the truth, and this is indeed a very serious case. We're talking about life or death."

The trial court granted Reed's motion to quash, and denied appellant's motion for new trial.

On appeal, we understand appellant's argument to be the trial court's granting Reed's motion to quash violated appellant's "right to due process and due course of law and his right to be free from cruel and unusual punishment under the U.S. and Texas Constitutions," since Reed's "information was highly material and relevant *because* it went directly *to impeach the testimony* of the jurors given in Court after they discussed their impending testimony with the prosecutor." (Emphasis Supplied). The State, in effect, argues appellant failed to prove Reed's information was "highly material and relevant."[8]

■■■ Appellant had the burden to prove his juror misconduct allegation at the hearing on his motion for new trial. See *Buentello v. State,* 826 S.W.2d 610, 611–14 (Tex.Cr.App.1992); *Sneed v. State,* 670 S.W.2d 262, 266 (Tex.Cr.App.1984). Since appellant couches his appellate arguments in terms of the *impeachment* value of Reed's information, we cannot say the trial court erred in granting Reed's motion to quash.

Appellant presented no affirmative evidence of juror misconduct; all twelve jurors at appellant's trial denied the applicability of the parole laws was a part of their deliberations on punishment. Assuming Reed testified, the trial court would have abused its discretion in granting the motion for new trial because there would have been no issues of fact as to juror misconduct for the trial court to resolve since Reed's hearsay information apparently could have been used only to impeach McAlister. See Tex.R.Crim.Evid. 612(a); cf. *Sneed,* 670 S.W.2d at 266 (issues of fact as to jury misconduct raised at a hearing on a motion for new trial are for the determination of the trial judge). On this record, appellant has not demonstrated how Reed's hearsay testimony for impeachment purposes would have aided him in proving his juror misconduct allegation or how the trial court's granting Reed's motion to quash violated appellant's constitutional rights, and we decline to make appellant's arguments for him. See Tex.R.App.Proc. 74. Therefore, under state law, appellant has waived his constitutional claims. Point of error twenty-seven is overruled.

Points of error twenty-eight through thirty-one were filed by the appellant pro se in the form of a supplemental brief. Appellant's appellate counsel offers to adopt these points as his own. However, he cites no authority that allows him to do this, nor does he, in fact, cite us to any authority on the merits of any of appellant's pro se points of error. Thus, we find this portion of the brief to be inadequately briefed and any contentions in it to be waived. Tex.R.App.Pro., Rule 74(d). As to the supplemental brief itself, appellant is not entitled to hybrid representation. *Landers v. State,* 550 S.W.2d 272, 280 (Tex.Cr.App.1977), opinion on rehearing. Hence, nothing is presented for review. *Turner v. State,* 805 S.W.2d 423, 425 (Tex.Cr.App.1991), n. 1, cert. denied, 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162. Points of error twenty-eight through thirty-one are waived.

The judgment is affirmed.

---

**8.** Both parties also argue about the applicability of a newsperson's qualified privilege to withhold evidence relevant to a pending criminal proceeding. In *Healey v. McMeans,* this Court held no such privilege exists. *Healey v. McMeans,* 884 S.W.2d 772 (Tex.Cr.App.1994).

CLINTON, Judge, concurring.

Disposing of appellant's eleventh point of error, the majority holds that, reading the jury charge as a whole, it is clear that error in the failure of the trial court to limit the abstract definition of "intent" found in V.T.C.A.Penal Code, § 6.03(a), to that part of the definition that relates only to "result of conduct" was harmless. For this proposition the majority cites *Hughes v. State*, 897 S.W.2d 285 (Tex.Cr.App.1994). There we used an analysis reminiscent of that in *Kinnamon v. State*, 791 S.W.2d 84 (Tex.Cr.App. 1990), to conclude that, though it was error not to limit the abstract definition of "intent" to "result of conduct" in charging the jury in a capital murder prosecution that involved no "nature of conduct" element, it was nevertheless harmless because, read as a whole, the jury charge adequately informed the jury that it must find it was the accused's conscious objective to cause the death of the deceased before it could convict. It seems to me that neither *Hughes* nor the majority today fully apprehends the nature of the problem. I therefore write separately.

The source of the problem resides in an ambiguity inherent in the language of § 6.03(a) itself. That provision defines "intent" as it applies to elements of penal offenses going both to result of conduct and to nature of conduct. It reads:

"A person acts intentionally, or with intent, with respect to the nature of his conduct *or* to a result of his conduct when it is his conscious objective or desire to engage in the conduct *or* cause the result."

Given the parallel structure of this sentence, it certainly seems on first impression that the purpose of the Legislature must have been alternatively to define "intent" *vis-a-vis* the result of conduct, *viz:*

"A person acts intentionally, or with intent, with respect to ... a result of conduct when it is his conscious objective or desire to ... cause the result";

and also "intent" *vis-a-vis* the nature of conduct, *viz:*

"A person acts intentionally, or with intent, with respect to the nature of his

conduct ... when it is his conscious objective or desire to engage in the conduct".

Unfortunately, this is not the only way to read § 6.03(a), given the use of the word "or" as highlighted above. It is possible that the provision was meant to define "intent" in either of the following two ways. First:

"A person acts intentionally, or with intent, with respect to ... a result of conduct when it is his conscious objective or desire to engage in the conduct *or* cause the result";

*or*, second:

"A person acts intentionally, or with intent, with respect to the nature of his conduct ... when it is his conscious objective or desire to engage in the conduct *or* cause the result."

Although almost certainly not the way the Legislature contemplated that § 6.03(a) would be read, this is nevertheless a plausible reading of that provision, and one that jurors should be disabused of, especially upon request. For even if this Court were to authoritatively construe the ambiguity out of the provision, it would still be necessary to inform the jury of that construction. Article 36.14, V.A.C.C.P.

For this reason, giving the jury an abstract definition of "intent" in the literal language of § 6.03(a) is error. This is so even if the offense contains proscriptions against both nature of conduct and result of conduct. See *Cook v. State*, 884 S.W.2d 485, 489–490, n. 3 (Tex.Cr.App.1994); *Hughes v. State*, supra, 897 S.W.2d at 295–96. It is true that for such an offense the jury will need an abstract definition of intent both as it pertains to nature of conduct and as it pertains to result of conduct. But those definitions must be separated out in much the way Judge Maloney recommended in his concurring opinion in *Cook*, supra, at 494. Otherwise there is always the chance that, when it comes to decide whether the accused intended to cause the proscribed result, the jury may believe it is authorized to conclude that he did intend to cause the result *simply because* he intended to engage in the conduct that caused that result. Under the literal terms of § 6.03(a), without clarifying language, a jury that drew that conclusion would not be unreasonable.

**500**

No amount of insistence in the application paragraph that the jury must find the accused specifically intended to cause the death of the deceased will solve the problem. The jury could still conclude it is authorized to find the accused intended to cause the result *simply because* he intended to engage in the conduct that caused it. For this reason I cannot join the majority's *Hughes* harmless-error analysis.

Nevertheless I concur in the result. Appellant did not object to the jury charge on this or any related basis. The question, therefore, is whether he suffered egregious harm in the failure of the trial court to clarify the ambiguity in § 6.03(a). *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1984) (Opinion on State's motion for rehearing). Here it is reasonably clear he did not. There was ample evidence from which the jury could conclude that appellant did in fact intend to cause the death of the deceased. See majority opinion at 487. Final summation at the conclusion of the guilt/innocence phase of trial was almost exclusively a debate over the strength of the State's evidence of identity. Only the State mentioned the issue of intent, and then, only in passing. Under the circumstances, even assuming the jurors noticed the ambiguity in the § 6.03(a) definition at all, it is most unlikely they would have found occasion to rely on it to justify their verdict. Viewing the entire record in the manner prescribed by *Almanza*, I see no egregious harm.

For this reason I concur in the majority's disposition of appellant's eleventh point of error, but not its rationale, and otherwise concur in the majority's judgment.

MALONEY, J., joins.