AFFIRM; Opinion issued October 31, 2012.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-11-00557-CR

## DARYL KENNETH WILLIAMS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5
Dallas County, Texas
Trial Court Cause No. F-1056972-L

# MEMORANDUM OPINION

Before Justices Moseley, Fillmore, and Myers
Opinion By Justice Fillmore

A jury found appellant Daryl Kenneth Williams guilty of the third degree felony offense of

hindering apprehension of a felon. The trial court sentenced Williams to two years' imprisonment,

suspending the sentence and placing Williams on two years' community supervision. In his sole

issue on appeal, Williams contends that the evidence was insufficient to support his conviction. We

affirm the trial court's judgment.

## Background

On the morning of June 17, 2010, FBI agents assigned to the bureau's gang task force and

Dallas Police Department officers assigned to the department's gang unit task force (collectively

referred to as "task force members") were working jointly to serve felony aggravated assault arrest

warrants on two gang members. An arrest warrant was served on one of the gang members at his residence, and he was taken into custody. The task force members then turned their attention to the other gang member, Jeffrey Alexander. Alexander is Williams's brother. Task force members went to the residence of one of Alexander's girlfriends, Amber Clark, to attempt service of the warrant on Alexander. Alexander was not found at Clark's residence. Task force members then proceeded to the residence of Alexander's mother, Wilma Faye Williams. Williams and Alexander's sister, Shadariann Williams, also lived at Wilma's apartment.

At Wilma's apartment, task force members spoke with Shadariann. According to Shadariann, Alexander arrived at Wilma's apartment around 8:00 p.m. or 9:00 p.m. the night before. She believed Williams arrived home from work about midnight. As far as Shadariann knew, Alexander was at the apartment when Williams came home from work. While at the apartment, task force members also spoke with Williams. Williams was informed the task force had an arrest warrant for a felony offense to be served on Alexander. Williams told Detective Joseph Markulec that he had been at the apartment all morning, he had not seen Alexander, and he did not know where Alexander was. Williams was cooperative, and the task force members believed what Williams told Markulec.

In their search of Wilma's apartment, task force members did not find Alexander. Wilma's bedroom door was locked, and the task force was unable to gain access to Wilma's bedroom. According to Shadariann, Wilma had the only key to unlock the bedroom door, and had spent the night away from home. Wilma was not at home that morning.

Task force members left Wilma's apartment and proceeded to the residence of another girlfriend of Alexander, Shenqua Leadon, at an adjacent apartment complex. Alexander was not found at Leadon's apartment. While Markulec and FBI special agent Lori Gibbs interviewed

-2-

Leadon, she answered her telephone. Leadon alerted Markulec that the caller was Alexander, and Leadon allowed Markulec to hold his ear near the telephone to hear Alexander's conversation with Leadon. Gibbs wrote down the telephone number of the incoming call to Leadon's phone.

The task force members then left Leadon's apartment and returned to Wilma's apartment, where they once again came in contact with Williams. Markulec explained to Williams that they had returned looking for Alexander and they believed Alexander was in Wilma's bedroom. Williams again stated Alexander was not at Wilma's apartment and he did not know where Alexander was located. Williams was cooperative at this point and allowed the task force to enter the apartment and look for Alexander. The task force members did not locate Alexander in the apartment. Again, Wilma's bedroom door was locked.

On her telephone, Gibbs dialed the telephone number of the call received by Leadon, and a telephone immediately rang in Williams's bedroom. Williams stated, "That is my phone." The ringing cellular phone on Williams's bed was seized by the task force. There was a picture of Williams on the front of the cellular phone. Williams's cellular phone was locked with password protection. Markulec questioned Williams about his telephone being used to call Leadon, and Williams became belligerent and combative and began shouting profanities. Because he would not stay in one place and was pacing back and forth, Williams was handcuffed to ensure officer safety.

After securing the cellular phone that was used to call Leadon, task force members were convinced Alexander was in his mother's locked bedroom. Markulec telephoned Wilma and requested she return to her apartment and unlock her bedroom door. For approximately two hours, task force members waited for Wilma to return and unlock her bedroom door. Williams was released from handcuffs, and he left the scene in his car. Shadariann also left the apartment.

When Wilma did not return to her apartment, Markulec and Detective Antonio Aleman left

Wilma's apartment to go to the police station and prepare a search warrant for Wilma's bedroom to be presented to a judge for signature. Other task force members remained stationed in front of Wilma's locked bedroom door.

Williams returned to the apartment complex parking lot in his car. He got out of his car and was playing loud music. He was shouting profanities at task force members who remained on the premises. Williams was also shouting at his aunts who were standing in the parking lot, because he did not appreciate his aunts cooperating with the task force. FBI special agent Michael Hillman advised Williams he was free to stay or to leave, but he could not stay and continue to shout. Williams again left the parking lot in his car.

Hillman began speaking to Alexander through the locked bedroom door. Hillman advised Alexander that officers had gone to obtain a search warrant. Hillman told Alexander that it was going to become necessary to obtain special weapons and tactics (SWAT) team assistance at the scene, and the SWAT team would likely fire tear gas into the apartment and treat Alexander as a barricaded person. The bedroom door would likely be torn down and Wilma's apartment damaged. After about fifteen minutes, Alexander spoke through the door to Hillman. Hillman told Alexander that his grandmother had arrived at the scene and was worried about him. Alexander opened the bedroom door, surrendered, and was placed under arrest.

Williams again returned to the parking lot. Hillman went to the parking lot to advise Alexander's grandmother that Alexander had come out of the bedroom. Williams was still upset and yelling at his relatives for their cooperation with the task force.

Hillman telephoned Markulec and Aleman to tell them Alexander had been taken into custody and to request they return to the scene. Markulec and Aleman returned to the apartment complex. They made a decision to arrest Williams at the scene for hindering apprehension of a

felon. During his arrest, Williams was uncooperative and combative and pushed pushing Markulec into a parked vehicle.

Based on everything they observed that day, Hillman and Aleman believed Williams allowed Alexander to remain in the apartment to avoid being served with the warrant and arrested. They also believed Williams allowed Alexander to use Williams's cellular phone to avoid being apprehended.

The jury found Williams guilty of the offense of hindering apprehension of a felon. The trial court sentenced Williams to two years' imprisonment, suspending the sentence and placing Williams on two years' community supervision. Williams filed this appeal of his conviction.

## Sufficiency of the Evidence

In his sole issue on appeal, Williams challenges the sufficiency of the evidence to support his conviction because there was insufficient evidence Williams knew or had reason to believe Alexander was in Wilma's locked bedroom or elsewhere in the apartment. Therefore, Williams asserts, no reasonable jury could conclude beyond a reasonable doubt that Williams harbored, concealed, or provided aid to another in avoiding arrest or effecting escape.

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony

presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of witness credibility and weight of the evidence, and may not substitute our judgment for that of the fact finder. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

In evaluating a sufficiency claim, we consider all evidence presented to the jury, regardless of whether it was properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits the offense of hindering the apprehension of a felon if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense, he harbors or conceals the other. TEX. PENAL CODE ANN. § 38.05(a)(1) (West 2011).[1] Whether the defendant possessed such an intent must ordinarily be established by circumstantial evidence. *King v. State*, 76 S.W.3d 659, 661 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see also Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (intent may be inferred from the acts, words, and conduct of the accused).

Williams argues the evidence is insufficient to show he knew or had reason to believe Alexander was in his mother's locked bedroom or elsewhere in the apartment. The evidence indicates that when task force members first came to Wilma's apartment, Williams told the officers

---

[1] An offense under section 38.05 is a third degree felony "if the person who is harbored, concealed, provided with a means of avoiding arrest or effecting escape, or warned of discovery or apprehension is under arrest for, charged with, or convicted of a felony." TEX. PENAL CODE ANN. § 38.05(d).

that he had been in the apartment all morning, he had not seen Alexander, and he did not know where Alexander was. However, Alexander placed a telephone call to Leadon on Williams's cellular phone later that morning and, when task force members returned to Wilma's apartment, that telephone was in Williams's bedroom. Despite Williams's cellular phone being utilized by Alexander to call Leadon, Williams continued to deny to task force members that he had seen Alexander that morning and that Alexander was present at the apartment. The jury could have reasonably inferred that in order for Williams's cellular phone to have been used by Alexander to call Leadon, Williams would have had to unlock the password protection or provide Alexander the password. Further, the jury could have reasonably inferred that the locked bedroom door had to have been opened and Williams's phone provided to Alexander for his use in making the call to Leadon. Alexander was either outside Wilma's bedroom when he placed the call to Leadon and returned to Wilma's bedroom after making the call, or Alexander was inside Wilma's bedroom when he made the call to Leadon and returned Williams's cellular phone before relocking himself in Wilma's bedroom.

The jury heard all the testimony. It was the role of the jury to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. Reviewing all the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could reasonably find from the evidence presented here that the essential elements of hindering apprehension of a felon were established beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. We resolve Williams's sole issue against him.

We affirm the trial court's judgment.

_____
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

110557F.U05



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

DARYL KENNETH WILLIAMS, Appellant

No. 05-11-00557-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the Criminal District Court No. 5 of Dallas County, Texas. (Tr.Ct.No. F-1056972-L).
Opinion delivered by Justice Fillmore, Justices Moseley and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 31, 2012.

ROBERT M. FILLMORE
JUSTICE